# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:10-cr-071-HRH-JDR |
| Plaintiff, | |
| vs. | **<u>RECOMMENDATION<br>REGARDING<br>MOTION TO SUPPRESS</u>** |
| JEREMY ROSS DIERMYER, | |
| Defendant. | (Docket No. 22) |

Defendant **Jeremy Ross Diermyer** moves to suppress his statements taken during interrogation on August 6, 2010 in a hotel room at the Dimond Mall Hotel on the south side of Anchorage. Docket 22. The motion is opposed by the United States. Docket 24. Counsel requested an opportunity to file further briefing after the evidentiary hearing.[1] An evidentiary hearing was conducted before the magistrate judge on September 29, 2010. Diermyer filed a Notice of Non-Filing of Supplemental Brief at Docket 37. No further pleading was filed by the government.

---

[1] Govt's Opposition to Motion, Docket 24, p.5.

The government agrees not to offer at trial the question posed by Special Agent Kevin Laws to which Diermyer declined to answer, namely, ". . . if it wasn't for us intervening, and that little girl was sitting right here now, you would be taking pictures of her naked, wouldn't you?"[2]   The parties disagree about whether subsequent questioning by Alaska State Trooper Nathan Bucknall should also be suppressed.  The outcome depends upon whether Trooper Bucknall scrupulously honored Diermyer's assertion of silence to the question whether he intended to photograph BK nude that evening.[3]  For reasons discussed below, the magistrate judge *concludes that the motion to suppress certain colloquy between Trooper Bucknall and Jeremy Diermyer during this interrogation should be granted.*

### Facts

Prior to August 6, 2010, Diermyer was the subject of an investigation by law enforcement officers for the offenses of production of child pornography and enticing a minor using the internet.  On the afternoon of August 6, officers arrived at the Dimond Mall parking area in anticipation of Diermyer meeting an alleged victim

---

[2] Exhibit 2, Transcript of Contact Interview, p.26,  (Transcript of the Interview/Interrogation.  Corrections have been made to this transcript by Troopers Bucknall and Dunford, with their initials appearing at the noted corrections.  None of these corrections impact the issues presented in the motion to suppress.  Defense counsel filed an Objection to the accuracy of the Transcript in this Exhibit.  Docket 39.

[3] The names of the minors have been redacted in conformity with F.R.Cv.P 49.1.

at the Dimond Mall and/or Dimond Mall Hotel.   Officers had learned that Diermyer reserved a room for that evening at the Hotel.

Officers intercepted Diermyer in the parking between the mall and hotel and detained him in a police vehicle.  Trooper Bucknall went to the Dimond Center Hotel and obtained a key for the room Diermyer reserved.  Officers had obtained a search warrant for the room (10-mj-107-DMS) and brought Diermyer there for a private interview.  The interrogation commenced about 6:15 to 6:30 PM.

Officers learned that Diermyer stated that he had a weapon in the room and officers removed the weapon.  While the questioning was conducted Diermyer was handcuffed with his hands in front.  The interrogation lasted just over one hour.

Officers made a digital audio recording of the interrogation on a recorder that was placed on a nearby bed.  Present during the interrogation were Homeland Security Investigations (formerly ICE) Special Agent (SA) Kevin Laws and Alaska State Trooper Nathan Bucknall.

Prior to the questioning, SA Laws read Diermyer his <u>Miranda</u> rights.  Diermyer was advised of his rights as follows:  "You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer (indiscernible) before we ask you any questions, and to have him with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before questioning, if you wish.  If you decide to answer questions now without a

lawyer present, you will still have the right to stop questioning at any time until you talk to a lawyer." Exhibit 2, Transcript of Contact Interview, pp. 3-4) SA Laws asked Diermyer if he understood each of those advisements as they were stated. Diermyer indicated that he did and also replied "yes" to whether he understood what had been read to him. Exhibit 2, p.4. SA Laws then asked Diermyer if, having those rights in mind, he wished to talk to them. Diermyer responded: "Yes." *Id.* p.4.

      SA Laws then told Diermyer that he was under arrest and asked him about his purpose in coming to that location. Diermyer indicated that he was meeting an individual named BK. The agent asked Diermyer to explain what was going to happen when she arrived. There was a discussion about Diermyer taking photographs of BK and another person named S who was supposed to come to the location at 8:00 PM. SA Laws asked about the ages of BK and S and what kind of photo shoot was going to take place. Diermyer indicated that BK was going to be clothed whereas the one with S was going to be a nude photo shoot. Exhibit 2, p.8.

      The agent asked how many other "models" he had photographed in a hotel setting. Diermyer indicated that he had previously taken photographs of an adult woman who worked at a night club using the name Jade. Discussion ensued about Diermyer getting releases from the other females to use their photographs.

      Diermyer asked what offense he was charged with and SA Laws told him that he was charged with enticement of a minor using the internet and attempted

production of child pornography. There was a discussion about whether Diermyer had any nude photographs of the identified juvenile females. Diermyer indicated that he had photos on his computer but that he did not believe there were any nude pictures. SA Laws did not ask Diermyer about the kind of pictures he had taken of the other juveniles.

SA Laws told Diermyer that they had intercepted chats that were explicit about wanting to take pictures of a naked little girl. Exhibit 2, p.16. SA Laws then asked Diermyer if his intention was to photograph little girls. Diermyer responded "No." Exhibit 2, p.16. The agent asked Diermyer to explain how that could be, considering the circumstances, and Diermyer responded that he had after thinking about it, ". . . an error in judgment." Exhibit 2, p.17.

This colloquy followed:

SA Laws: So, you are - - you're intention, you know - - if it wasn't for us intervening, and that little girl was sitting right here now, you would be taking pictures of her naked, wouldn't you?
Answer: I don't think so. No, sir.
Question: You don't think so?
Answer: No.
Question: So that's not a definite, No. If you had the opportunity, and she's sitting right here, you, more than likely, would."
After a long pause Diermyer responded "I'm not gonna answer either way, Sir."
SA Laws: Question: You're not going to answer either way, Okay.

SA Laws asked questions on different topics. SA Laws asked Diermyer: Who was at his house? Was he at his home last night? Where are you employed? Would we find more computers full of pictures at your house? Is there child pornography images on your laptop? What is you definition of "child pornography"? Do you have pictures of naked children on your computer? Do you use encryption? Did you buy your computer new? What is your password? Do you use your wife's computer? How big is your hard drive? What kind of cameras do you have? Diermyer demonstrated that he was able to consider each of these questions individually and declined to give his password. These questions by SA Laws are not challenged by the defendant in his motion to suppress.

Interrogation began by Trooper Bucknall who prefaced his first question with a statement that "we know you were going to do it -- the question is why? " Exhibit 2. p.26 lines 1-24. He told Diermyer that they knew what he had said in his chats and he was not discussing that but was more interested in why he wanted to take nude photographs of "her." In his response, Diermyer stated that he didn't plan on taking the photos and then explained that he and his wife were having marital problems. Trooper Bucknall stated that he needed "to understand why [Diermyer] decided to take these nudes and what [his] intent of them was. Exhibit 2, p.30, line 24 - p. 31, line 1. The Trooper asked Diermyer if he had any intent to put any of the pictures on the internet. The Trooper told Diermyer that he should "own up to his

mistakes" especially since he was in the military and that he had to acknowledge his problem before a solution could be found. There was a discussion about the definition of child pornography and what Diermyer intended to do with the photographs if he took them.

In another question Trooper Bucknall stated "[y]ou know, you made a choice to take these sexual pictures of her, and that's where the error in judgment came." Exhibit 2, p.42, line 24 - p.43, line 1.

Trooper Bucknall told Diermyer that he knew there were a couple of things he didn't want to talk about, but, "it was very obvious you were gonna take [the photographs]," and that Diermyer was trying to get [the juvenile] to send [him] pictures of herself nude. Exhibit 2, p.46, lines 4-7. He then asked Diermyer if there was anything he wanted to talk to the investigators about and Diermyer gave no audible response. *Id.* at lines 23-25.

## II. Discussion of Law

The principal topic during the interrogation was whether Diermyer intended to take nude photographic pictures of a minor, with whom he had been chatting on line during the preceding weeks. Mr. Diermyer admitted that he had discussions on the topic with the minor but took the position that he had no intention of following through with taking the nude photographs. When SA Laws asked Diermyer if he would have taken pictures of BK naked if the agents had not shown

up, Diermyer's response was not an unequivocal "no" but rather "I don't think so. No, sir." SA Laws them followed up seeking clarification of that response. When he asked "you don't think so?" Diermyer responded "No." Rather than accept the "no" at face value SA Laws again asked the question in the following manner: "So that's not a definite, no. If you had the opportunity, and she's sitting here, you, more than likely, would[?]" To that question Diermyer responded that he was not going to answer either way. No further clarification of Diermyer's response was sought by either investigator during the remaining interview.

Diermyer argues that the officers violated his Fifth Amendment right to remain silent and that they had a duty to clarify the extent of his assertion of silence or remind him that he could decline to answer further questions. Because they did not do so, he argues, the interview should have ended when he declined to answer the question "either way". Alternatively, he argues that the investigator should not have asked him any further questions on the "topic" to which he asserted his right to remain silent. The defendant characterized this topic as "whether Diermyer intended to take illicit photographs of the minor."[4] The government argues that Diermyer did not invoke his right to limit the topic discussed during the interrogation.

//

//

---

[4] Motion to Suppress, Docket 22, p.2

A.    <u>Voluntariness of Statement</u>

Diermyer's statements to the officers were made voluntarily. The totality of the circumstances is considered in the determination of whether the suspect's confession was involuntary.  18 U.S.C. § 3501(b).  At the time of the interview, Diermyer was told that he was under arrest and during the interview he was told the nature of the criminal conduct offense for which he was being charged.  Diermyer was advised that he was not required to make any statements and of his right to counsel.  The interview did not last a prolonged period of time.

A confession is involuntary only if it is the product of coercion by government agents.  <u>Colorado v. Connolly</u>, 479 U.S. 157, 107 S. Ct. 513 (1986). The ultimate question of voluntariness of a confession is a legal question under the Due Process Clause.  <i>See</i> <u>Miller v. Fenton</u>, 474 U.S. 104, 106 S. Ct. 445 (1985).

It is clear that a defendant who voluntarily speaks after receiving <u>Miranda</u> warnings has not been induced to remain silent.  A criminal defendant's confession is involuntary if coerced either by physical intimidation or psychological pressure.  <u>United States v. Shi</u>, 525 F.3d 709, 730 (9th Cir. 2008).  No such pressure is evidenced in the instant case.

As part of the totality of the circumstances the court considers the information that Diermyer told SA Laws prior to telling him that he did not want to

answer any particular question one way or the other.  Diermyer continued to answer questions from SA Laws.

It is clear from listening to the audio recording, Exhibit 1, that Diermyer knowingly and intelligently agreed to answer and did answer questions posed by the officers after waiving his rights under Miranda.

> B.   Whether the Interrogation Should Have Ended When Diermyer Declined to Answer a Particular Question

Diermyer did not remain silent after declining to answer a particular question posed by SA Laws.  Nor did he specify a particular subject matter he did not want to address at the interview.  "A suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial.  Hurd v. Terhune, supra at p.10, citing Miranda, 384 U.S. at 473-74.

Berghuis v. Thompkins, ___ U.S. __, 130 S. Ct. 2250 (2010) holds that a criminal defendant must affirmatively and unambiguously invoke his right to remain silent if he wishes to cut off police interrogation.  *Id.* at 2260.  Diermyer did not do that.  Rather, he indicated he would not answer a particular hypothetical question "either way."  Ex 2, p.18   This was consistent with his right to refuse to be interviewed in a particular manner even though he had already waived his right with respect to the subject matter of the interrogation.  *Cf.* Arnold v. Runnels, 421 F.3d 859, 866 (9th Cir. 2005)(holding that a suspect may refuse to be interviewed on tape

when he had already waived his right to silence).  Case law also holds that a defendant may remain "partially silent" by answering some questions and refusing to answer others.  United States v. May, 52 F.3d 885, 890 (10th Cir. 1995); United States v. Canterbury, 985 F.2d 483, 486 (10th Cir. 1993); United States v. Scott, 47 F.3d 904, 907 (9th Cir. 1995).

　　　　The Supreme Court has recognized the need to provide guidance to officers conducting interrogations.  The determination of whether the suspect has invoked a Miranda right is an objective inquiry.  Davis v. United States, 512 U.S. 452, 114 S. Ct. 2350, 2355 (1994).  Davis holds that the invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  Id. citing McNeil v. Wisconsin, 501 U.S. 171, 111 S. CT. 2004 (1991).

　　　　In applying such objective test here, the invocation of a Miranda right by Diermyer required, at a minimum, some statement that could reasonably be construed by the agents as an expression of his desire either not to answer any further questions or to limit the topic of questions in some manner.  Since Diermyer made no reference that a reasonable officer could have understood, that he wanted the interrogation to cease, no clarification by the officers at the interview was necessary before they asked additional questions.  Diermyer clearly asserted a right to remain silent to the above mentioned question asked by SA Laws. Exhibit 2, p.18,

line 25.  He freely answered other questions after he refused to answer the question about whether he intended to take nude pictures of BK.  Thus, the act of asking more questions without seeking additional clarification did not violate Diermyer's rights under <u>Miranda</u> or the Fifth Amendment to the Constitution.

Although there is no "talismanic phrase" to invoke the right to silence, Diermyer never referred to his right to remain silent nor did he assert silence with respect to further interrogation.  Rather, his response was that he was not going to answer whether he would have taken photographs of BK nude.   The defendant can point to nothing he said or did that would indicate that he did not want to answer any more questions.  The magistrate judge concludes that Diermyer's responses to questions posed by Trooper Bucknall were the product of a free and deliberate choice and not intimidation, coercion or deception.   He never challenged the meaning of the questions asked by the officers nor did he ask to have any question restated.   <u>Compare</u>, <u>United States v. Lopez-Diaz</u>, 630 F.2d 661, 664 (9th Cir. 1980)(defendant stated he did not want to talk about the drugs found in the van).  SA Laws moved on to other topics which Diermyer answered without hesitation and without bringing up the topic of his desire to remain silent.  Diermyer never effectively invoked his right to remain silent as to any further interrogation.

//

//

C.    Whether Miranda was Violated.

SA Laws advised Diermyer of his Miranda rights. Miranda at 478-79. There is no issue about the adequacy of these warnings or whether Diermyer understood his rights, including his right to assert silence.  Diermyer clearly waived his Miranda rights knowingly and intelligently and agreed to answer questions.  The record shows that he had a basic understanding of his Miranda rights and that his initial decision to talk with the investigators was not coerced.  He was informed he was under arrest and throughout the interview the officers identified some of the evidence against him.  Mr. Diermyer never said he wanted an attorney or that he did not want to talk to the officers.  The defendant cites Hurd v. Terhune, 619 F.3d 1080 (9th Cir. 2010), for the legal point that a person may exercise his right to silence at any time.  That point is not in dispute.

The defendant argues that the duty of the police to "scrupulously honor" the defendant's assertion of silence means that they should not have continued to interrogate Mr. Diermyer "on the same issue for which [he] had asserted silence." Motion to Suppress, Docket 22, p.3.  The government recognizes Mr. Diermyer's right to refuse to answer the particular question posed by SA Laws, and agrees not to use that question or his answer at trial.  Government's Opposition, Docket 24, p.2. The government argues that since the defendant did not verbally and specifically invoke his right to limit the topic discussed during the continued interview the

government should not be precluded from seeking to admit his additional statements at trial.

Miranda applies to every question investigators pose. Miranda, 384 U.S. at 473-74; Doyle v. Ohio, 426 U.S. 610, 618-19 (1976). The Miranda warnings are procedural safeguards to "secure the privilege against self-incrimination." Miranda, at 444. Case law is clear that the mere fact that a suspect may answer some questions does not deprive him of the right to cease answering any further inquiries. Id. at 445. Miranda warnings implicitly promise that silence will carry no penalty Doyle at 618-19.

Even if the topic of the question Diermyer declined to answer is construed narrowly so as to refer to what Diermyer would have done if he had met with BK absent the officers intervention, Trooper Bucknall's method of interrogation remains troublesome because he prefaced many of his questions with a statement that "we know you were going to do it" (even though Diermyer had denied that he would have photographed BK nude). Exhibit 2, p.26. An officer may question a suspect about his conduct and motivation but the officer must scrupulously honor the suspect's limited assertion of silence. When a suspect has properly invoked his right to remain silent with respect to a particular question, it violates the spirit and intent of Miranda and its progeny for the investigators to ask follow-up questions that continually place in issue the response to the question the suspect declined to

answer.  Federal law clearly prohibits the use of a criminal defendant's post-Miranda silence against him in court.  A reasonable application of this law requires the government to establish that the defendant either waived his right to remain silent or never effectively invoked it.  *See* Hurd at 10, citing Arnold v. Runnels, 421 F.3d 859, 866 (9th Cir. 2005).  The government has not done so.  The suspect is not required to reassert repeatedly his right to remain silent.

Although neither the Constitution nor Miranda requires a suspect to invoke his right to silence in a particular way,  it is improper to speculate on the reasons for a suspect's invocation of his right to remain silent.  Given the totality of the circumstances, I conclude that Diermyer did not intend to terminate the interview but that he did intend to limit the scope of questioning about photographing BK nude.[5]

The requirements of Miranda allow a suspect in custody to limit questioning.  The suspect may tell the officers that he will not discuss certain subjects or he may indicate his willingness to discuss only particular information. United States v. Soliz, 129 F.3d 499, 504 (9th Cir. 1997). Soliz invoked his right to remain silent on all subjects except his citizenship.  The agents violated his right when they proceeded to question him about other activities.  *Id.* at 504. The facts in

---

[5] This ruling does not preclude the defendant from presenting at trial evidence of the physical or psychological environment that yielded his responses.

Case 3:10-cr-00071-HRH   Document 43   Filed 11/12/10   Page 15 of 23

Michigan v. Mosley, 423 U.S. 96, 103-04 (1975), cited by the government, are distinguishable. There, the defendant stated that he did not want to discuss the offense for which he was being held. 423 U.S. at 105-06. In the instant case, the defendant indicated that he did not want to talk about a particular subject.

At the outset of the interview, Diermyer was told that he could decide to answer questions without a lawyer present but he still had the right to stop the questioning at any time until he talked to a lawyer. He was warned that anything he said could be used against him in a court and that he had the right to remain silent. Exhibit 2, pp. 3-4. He was specifically asked whether with those rights in mind he wanted to talk to the agents then. The Miranda warnings do not require a suspect to be told that he has the right to selectively answer some questions while exercising his right to remain silent as to other questions.

The additional questions asked by Trooper Bucknall were sufficiently similar to or related to the question Diermyer declined to answer, namely if he would have taken pictures of BK naked absent police intervention. Trooper Bucknall failed to scrupulously honor Diermyer's assertion of silence during his interrogation. *See* Exhibit 2, beginning at the top of page 26 of the transcript.

Questioning by Investigator Bucknall

Q:      . . . we know you were going to do it --it's why. And
        that's the question I really want to answer.
        . . . want to understand why you decided to do this
–

. . . We know you were going to do it, but why?

Exhibit 2, p.27

. . . have you had thoughts . . . of people under 18 for a long time?

Exhibit 2, p.28

. . . why you wanted to take nude photographs of her.

. . . maybe, . . . were going to take . . . nudes of her was because you and your wife . . . aren't doing so well in that area?

Exhibit 2, p.29

. . . first step of getting past this is admitting: . . . This is why I did it.

. . . we gotta figure out why this happened.

Exhibit 2, p.30

. . . Hey, . . . I was gonna take some nudes of her.

. . . I just need to understand why you decided to take these nudes and what your intent of them was.

Exhibit 2, p.31

. . . did you ever have any intent to put them out on the Internet.

. . . I had no intent of . . .

Exhibit 2, p.32

. . . when you made that mistake,

. . . You own up to it . . .

Exhibit 2, p.33

. . . so we gotta figure out why that was happening.

. . . is this a sort of taste that you've had for a long time . . .

Exhibit 2, p.34

. . . what started it this time?

Exhibit 2, p.36

. . . Was it . . . maybe find yourself sexually?

. . . I was just lookin' for, you . . . a one night-stand . . .

Exhibit 2, p.37

. . . that doesn't explain the part of you photographing you guys having sex, . . .

. . . if you wanna keep looking at it and kinda reliving that in your mind, you would take photos.

Exhibit 2, p.38
> . . . I was gonna do the photos as a . . .as a friend thing . . .

Exhibit 2, p.39
> . . . if you had those sexual photos of her . . .
> . . . does anyone else know you were gonna have this encounter? . . .

Exhibit 2, p.40
> . . . at one point, you . . . said, "Hey, taking pictures of you nude, under 18, is still illegal."

Exhibit 2, p.41
> . . . you recognized it was illegal, but you were willing . . .
> . . . to take that chance?

Exhibit 2, p.42
> . . . why? . . . I . . . just trying to understand . . .
> . . .You know, made a choice to take these sexual pictures of her . . .

The officers were duty-bound to scrupulously honor his request to remain silent with regard what he would have done had he been alone with BK. Trooper Bucknall did not ask Diermyer directly about his intentions, but rather indirectly by asking him to explain "why" he decided to meet with BK. Specifically, the Trooper asked why Diermyer wanted to take nude photographs of BK without distinguishing what Diermyer intended to do from whether he would in fact have done it.. Exhibit 2, p.28, lines 7 - 8. Building on that question he then asked Diermyer what he intended to do with the photographs which he presumably would have taken. Exhibit 2, p.30, line 24 - p.31, line 1. The Trooper asked for an explanation of why Diermyer wanted to photograph them having sex. Exhibit 2,

p.36, line 25 - p.37, line 4.  In another question he told Diermyer that he had made a choice to take sexual pictures of the minor which was an "error in judgment."  The investigator did not limit his questions regarding photographs of minors to events in the past but asked about Diermyer's intent to use photos of BK on the internet. Exhibit 2,  p. 38, lines 5 - 8.  In this colloquy Diermyer responded that he was going to take the photographs "as a friend thing" and then give the photographs to BK.  By asking questions with the assumption that Diermyer would have photographed BK nude, the investigator was able to get Mr. Diermyer to respond to what he was going to do if the officers had not shown up even though Diermyer had exercised his right to remain silent as to that question.  Trooper Bucknall repeatedly told Diermyer that it was obvious to him that Diermyer was going to take the photographs.  *See*, Exhibit 2, p.46, lines 4 - 7.

  Trooper Bucknall prefaced some of his questions with the statement "We know you were going to do it - - its why[?]"  Exhibit 2, p.26, lines 11-12.  Before Diermyer could answer, the trooper continued with his colloquy: "And that's the question I really want to answer  . . . What else is goin' on here.  So we more or less want to understand why you decided to do this -- and, not necessarily you were going to -- like I said, we know you were going to do it, but, why? . . . ." *Id.* at lines 12 - 24.

The Trooper suggested possible motives and stated that the first step in getting past an issue is realizing that there is a problem. *Id.* at p.27, lines 2 - 13. Finally, in that dialogue he stated "I mean, have you had thoughts of this -- of people under 18 for a long time? Or, is it a newer thing?" *Id.* at lines 13 - 16. All of these questions were stated in a single speech before Diermyer gave an answer. The dialogue included the question ". . . like I said, we know you were going to do it, but, why?"[6] At this point Diermyer responded that the relationship with his wife had been really bad lately. *Id.* at p.27, lines 17-18.

Trooper Bucknall repeated his preparatory remarks before attempting to get an answer as to why Diermyer intended to take such photographs. For example, the Trooper prefaced some of his questions with a statement that they knew what Diermyer had said because they intercepted chats. In context, this remark was another way of stating "we know you were going to do it." During the ensuing colloquy Trooper Bucknall made the following statements: " I just need to understand why you decided to take these nudes and what your intent of them was. Exhibit 2, p.30, line 24-p.31, line1. He continued, "[a]nd when you made that mistake, especially being in the military . . . [y]ou own up to it and you get past it." Exhibit 2, p.32 line 6-10. And further "[b]ut, you were going [to do] it, so we gotta figure out why that was happening." Exhibit 2, p.33, lines 3-4. Then Bucknall stated

---

[6] Exhibit 2, Transcript of Contact Interview, p. 26, lines 23-24.

". . .  [i]s this a sort of taste that you've had for a long time, or is this something newer that's come around?"  Exhibit 2, p.33, lines 14-17.  ". . . [m]y goal here is to make sure that this young lady wasn't gonna end up all over the Internet . . . . "  Exhibit 2, p.38, lines 6-8.  These statements assumes that Diermyer was going to take nude pictures of the minor.  And then, Bucknall makes  the assumption explicit when he states "[y]ou know, you made a choice to take the sexual pictures of her, and that's where the error in judgment came."  Exhibit 2, p.42, line 24 - p.43, line 1.

These questions and similar questions posed by Trooper Bucknall violated Miranda and the defendant's right to assert partial silence during his interrogation by failing to respect Diermyer's clear statement that he did not want to answer any further questions about whether he would have been taking pictures of BK naked if the officers had not intervened.  The effect of telling Diermyer that the officers knew he was going to do it and then asking "why" placed Diermyer in the position of either readdressing the question to which he had asserted silence or responding to the question of "why," thereby raising the inference that he did not dispute the statement that he was going to do it.

### III  Summary

The investigators were not required to cease questioning immediately upon Diermyer declining to answer a particular question.  They were, however, required to respect his wishes regarding his right to decline to answer a question

about taking pictures of BK naked on August 6, 2010.  I conclude that a reasonable officer would have comprehended that Diermyer's invocation of his right to remain silent as to the particular question included restatements of the same question.  It appears that SA Laws understood the ramifications of the invocation of the right to remain silent by Diermyer, but Trooper Bucknall did not "scrupulously honor" that invocation.

The challenged questions by Trooper Bucknall effectively imposed a burden on the suspect to explain why he did not want to answer the question after his right to silence had been invoked.  The Motion to Suppress should be GRANTED. To rule otherwise would not ensure compliance with the Miranda requirement through the exercise of the exclusionary rule.

DATED this 12th day of November, 2010, at Anchorage, Alaska.


   /s/ John D. Roberts                             
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON on November 18, 2010**.  The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-1189

(9th Cir.), <u>cert</u>. <u>denied</u>, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation <u>United States v. Howell</u>, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON November 22, 2010**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).